UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| REBECCA WOODRING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:18-cv-00243-TWP-DML |
| | ) |
| JACKSON COUNTY, INDIANA, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Cross-Motions for Summary Judgment filed by Plaintiff Rebecca Woodring ("Woodring") and Defendant Jackson County, Indiana ("Jackson County," or the "County"). The parties ask the Court to determine the constitutionality of a Nativity scene placed on the lawn of the historical Jackson County Courthouse during the winter holiday season. Woodring, a citizen of Jackson County, asserts the Nativity scene is a religious symbol that violates the First Amendment to the United States Constitution and should be removed. Jackson County wants to continue to display the crèche—a model representing the scene of Jesus Christ's birth — in a public place, arguing it comports with the First Amendment. Jackson County moved to dismiss, and the Court denied that motion. (Filing No. 37.)  Both parties have moved for summary judgment.  (Filing No. 32; Filing No. 38.)  For the reasons explained below, the Court **grants** Woodring's Motion for Summary Judgment and **denies** Jackson County's Cross-motion.

## I.      BACKGROUND

The historic Jackson County Courthouse (the "Courthouse") is located in Brownstown, Indiana, the county seat. (Filing No. 32-1 at 6.) It sits in a square formed by the intersections of S. Main (U.S. Route 50), E. Walnut, S. Sugar, and E. Cross Streets.  *Id.*  One of its two entrances

faces Main Street in Brownstown.  *Id.* at 6-7.  The term "courthouse" is a misnomer, because the historical Courthouse structure no longer houses county courts. Within the last two years, Jackson County's courts were relocated to a judicial center situated directly behind the Courthouse.  *Id.* at 7.  The Courthouse contains various county offices, including the treasurer, auditor, assessor, record, surveyor, planning and zoning. *Id.*

There is an ample lawn on the Main Street side of the Courthouse. *Id.* at 66, 75. To memorialize veterans, a large Sherman tank sits on the Main Street side of the Courthouse, near the intersection of South Main and East Walnut Streets.  *Id.* at 8.  On the other side of the Courthouse lawn, near the intersection of South Main and East Cross Streets, there is a flagpole, bell, and veteran's memorial that contains a granite monument. *Id.* at 8-9. There are no other permanent fixtures on the lawn.  *Id.* at 9.

The minutes of a Special Meeting of the Jackson County Commissioners ("County Commissioners") reflect that in December of 2001, the then-President of the County Commissioners "publicly apologized for not having a nativity scene in the Courthouse yard."  *Id.* at 11-12, 67.  During the holiday season in 2000 the former Courthouse custodian borrowed a display from a local church and placed it on the lawn, although it is unclear what the display included.  *Id.* at 13.  But it is also unclear whether that display had been exhibited for more than one year.  *Id.* at 14.  It is clear that no such display was exhibited in 2001.  *Id.* at 13.

In 2002, the Brownstown Chamber of Commerce sought and received permission from the Jackson County Commissioners to put up decorations on the fence and lawn for its "Christmas Celebration."  *Id.* at 15, 68. These decorations remained up for the 2002 Christmas season, although it is unclear what these decorations consisted of. *Id.* at 15. However, in 2003 the Brownstown Ministerial Association purchased a lighted Nativity scene, and the County

Commissioners approved it being placed on the Courthouse lawn for the "Christmas Holiday." *Id.* at 70. This is the display that the County still exhibits currently around Christmas time each year. *Id.* at 16. Since 2003, there have been no further votes by the County Commissioners concerning allowing the lighted Nativity scene on the lawn of the Courthouse. *Id.*

Although the Nativity display is owned by the Brownstown Ministerial Association, it is cared for by the Lions Club. *Id.* at 10-11. Caring for the display includes replacing bulbs, storing the figures, and erecting and removing the display. *Id.* at 19. Beginning in 2003, the Lions Club has consistently placed the display on the Courthouse lawn shortly after Thanksgiving. *Id.* at 17. It is taken down after the first of the year. *Id.*

The display depicts a number of figures which take the form of rigid, white, metal frames outlined in lights. *Id.* at 18, 29. The lights are on a timer that turns on at dusk and off at dawn. *Id.* at 18. Although the display is owned by the Ministerial Association and maintained by the Lions Club, the electricity to light the display is paid for by Jackson County. *Id.*

The display was unchanged from 2003 until late in 2018. *Id.* at 26-27. Viewed from the front of the Courthouse, to the right of the sidewalk, stood the lighted figures of the baby Jesus in the manger with Mary and Joseph near the child; two angels with upright trumpets on either side of the manger and animals and a man with a staff facing the mangers. *Id.* at 72-76. Across the sidewalk are Magi with crowns, carrying gifts, pointed toward the manger and accompanied by a camel. *Id.*

Before late 2018 (possibly since 2003), near the tank on one corner of the front lawn of the Courthouse, there were also lighted figures of Santa Claus, a sleigh, and a reindeer. *Id.* at 47-48, 66, 78. On the other side of the Courthouse lawn, facing a side street, were lighted figures of two

adults and two children, standing in front of the outlined figure of a lamppost, giving the appearance of carolers. *Id.* at 45-47, 66, 78.

On December 13, 2018, an attorney from the Freedom From Religion Foundation sent a letter to the County Commissioners, arguing that the crèche display violated the Establishment Clause and requesting that the First Amendment violation be remedied. *Id.* at 73-74. Immediately after receipt, the letter was made public and there was a rally at the Courthouse where two Commissioners spoke and others said prayers. *Id.* at 38-39. At some point, the President of the County Commissioners, Matt Reedy, physically moved the Santa Claus figure and the carolers to a place nearer the crèche. But on the other side of the walk leading into the Courthouse. *Id.* at 17-18, 28, 72. Santa is at the front of figures that, facing the Courthouse, are on the left side of the walk going to the Courthouse. *Id.* at 21-22, 72. Between the carolers and Santa is at least one crowned king bearing a gift pointed to the crèche, with a camel. *Id.* The display on the right side of the sidewalk, containing the baby Jesus, Mary, Joseph, manger, angels with upraised trumpets, shepherd, and animals, was not altered. *Id.* at 44.

The secular elements of the display were moved to minimize the distance between the objects in the display so that each element was in the same "visual field of view." *Id.* at 36. The Commissioners moved the secular elements in an attempt to avoid litigation after receiving the letter from the Freedom from Religion Foundation. *Id.* It is unclear whether the migration of the secular elements of the display closer to the crèche would be repeated in future years. On July 2, 2019, the County Commissioners sent a letter to the Brownstown Lions Club instructing them to keep the secular elements near the crèche. The letter said:

> As you know, in December of 2018, some of the items in the lighted Christmas display installed by the Lions Club on the lawn of the Historic Jackson County Courthouse ("Courthouse") were moved at the request and with the approval of the Jackson County Commissioners to be closer to one another, such

that all items can be seen in one field of view when looking at the front of the Courthouse, without having to scan left or right. Attached to this letter is a picture of the Christmas Display as it appeared after the move.

The Jackson County Commissioners intended for this change to be permanent. Therefore, effective with the change in 2018 and permanently thereafter, if there is to be a Christmas display on the Courthouse lawn, it shall comport with the above requirements, it shall contain at least as many and as large non-religious items as were displayed 2018 and prior, and the items shall be placed at least as close to each other as depicted in the attached picture.

Thank you for your cooperation and compliance with this directive.

(Filing No. 32-3 at 1.)

Plaintiff Rebecca Woodring is an adult resident of Seymour, Indiana, which is located in Jackson County. (Filing No. 32-2 at 1.)[1] She lives with her girlfriend and her children. *Id.* The couple have a day-care business and also have a business making t-shirts and other items. *Id.* Woodring is a taxpayer in Jackson County, and she notes that the Nativity display is lit through public funding as the electricity is paid by the county. *Id.* at 18.  Although she does not live in Brownstown, she frequently travels to and through Brownstown during the course of her everyday activities. These travels require her to pass by the Courthouse on U.S. Route 50, also known as Main Street, or go to a location where she must view the front lawn of the Courthouse that faces Main Street. *Id.* Beginning in November 2018, she traveled to Brownstown on a number of occasions in connection with her divorce, which she handled without an attorney. *Id.* at 2. On one of these occasions she accidentally entered the Courthouse and was directed to the new justice center building that is directly behind the Courthouse. *Id.* Each time she went to the courts building,

---

[1] Jackson County has asked the Court to strike Woodring's Declaration, found at Filing No. 32-2. The County argues the Declaration is a "sham," that it is "self-serving," and that it contradicts Woodring's deposition testimony. (Filing No. 38 at 19-22.) The Court disagrees. In her four-page Declaration, Woodring informs the Court of her living situation, the frequency with which she travels to Brownstown and the reasons for those visits, and her objection to the manger scene on the Courthouse lawn. (Filing No. 32-2.) The Declaration does not conflict with her deposition testimony. Moreover, it is useful to the Court to understand some basic background facts about the Plaintiff. The Court will not strike the Declaration. To the extent the above-cited pages of Jackson County's brief can be construed as a Motion to Strike, that Motion is **denied**.

she passed by the Courthouse or she passed near enough to the Courthouse that she could see the Courthouse's front lawn facing Main Street. *Id.*

Woodring's divorce was granted in early 2019, but she continues to travel on Main Street by the Courthouse. *Id.* Among other things, for her business she has delivered, and will continue to deliver, t-shirts and other items to Brownstown or otherwise engage in business-related travel that has required her, and will continue to require her, to travel on Main Street by the Courthouse. *Id.* Additionally, Woodring is working with the Jackson County Prosecutor's Office to collect child support from the father of her children. *Id.* at 3. This process has required and will continue to require her to visit the prosecutor's office, which is in the judicial center behind the Courthouse. *Id.* From January 2019 through August 2019, Woodring visited Brownstown at least 35 times, and traveled on Main Street, past the Courthouse or next to it, and has observed the lawn on the building's Main Street side, on most, if not all, of these occasions. *Id.*

Woodring is an atheist and believes that government should not be involved in religious activity. *Id.* at 4. The Nativity scene on government property offends her. She believes it forces or projects a belief onto her that she does not share, and it is not the role of government to project or endorse religious beliefs. *Id.* She did not alter her behavior to avoid seeing the display during the 2018 holiday season. *Id.* She does not plan to alter her behavior if the display is erected in the future because there is really no way to travel through Brownstown and avoid the front lawn of the Courthouse. *Id.*

## II.   LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is only appropriate by the terms of Rule 56

where there exists "no genuine issue as to any material facts and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996).  Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial.  *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

A court is not permitted to conduct a paper trial on the merits of a claim and may not use summary judgment as a vehicle for resolving factual disputes. *Ritchie v. Glidden Co., ICI Paints World-Grp.*, 242 F.3d 713, 723 (7th Cir. 2001); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). A court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

### III.   DISCUSSION

Each party has moved for summary judgment, and the material facts are nearly undisputed. Woodring argues she is entitled to summary judgment because the Nativity scene violates the First Amendment—"it lacks a secular purposes and represents endorsement of religion." (Filing No. 33 at 22.)  Jackson County seeks summary judgment on two grounds, arguing first that Woodring lacks standing to sue under Article III and second that the Nativity scene conforms with the First Amendment under any jurisprudential test. (Filing No. 38.) The Court will first address Jackson County's standing argument and then turn to the constitutionality of the Nativity scene.

### A.   Standing

Article III of the Constitution limits judicial power to actual cases and controversies. *See* U.S. Const. Art. III, §2.  Standing requires a showing that the plaintiff "has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," that the injury, "fairly can be traced to the challenged action," and that the injury "is likely to be redressed by a favorable decision" from the Court. *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The parties dispute both whether Woodring suffered an actual or threatened injury and whether that injury is redressable by this Court.

### 1.   Injury

Jackson County asserts two grounds for its argument that Woodring has not suffered an injury in fact.  First, it claims that "alleged psychological injury arising from offense at displays including religious imagery is not enough for standing under Article III." (Filing No. 38 at 23.) In support, it cites *Valley Forge* and several cases from the Seventh Circuit Court of Appeals. *Id.* at

23-25.  Second, Jackson County argues that Woodring "has no legal or other obligations, or need for government services, that require her to travel to the Courthouse," and she has not changed her behavior to avoid seeing the display. Because she is not forced to interact with the display to "participate fully as a citizen and to fulfill legal obligations," she has suffered no injury, Jackson County argues.  *Id.* at 26-27.  Woodring argues both that she has standing to sue as a taxpayer of Jackson County, which provides the electricity to light up the crèche, and that she has suffered an actual injury by confronting the display in the course of her everyday life as a citizen of Jackson County.  (Filing No. 52 at 8-15.)

The foundational case on "psychological injury," is *Valley Forge*.  Ruling on the case in 1982, the United States Supreme Court held "the psychological consequence presumably produced by observation of conduct with which one disagrees," on its own, is not an injury that creates standing under Article III.  454 U.S. at 485-86.  But the court also made clear that it "did not retreat from [its] earlier holdings that standing may be predicated on noneconomic injury."  *Id.* at 487 (citing *U.S. v. SCRAP*, 412 U.S. 669, 686-88 (1973), *et al.*).  In *Valley Forge,* the court determined that an organization and its employees, located in Maryland, Virginia, and Washington, D.C., did not have standing to challenge the transfer of property in Pennsylvania to a religious organization, because it did not appear that the organization or its employees ever had direct conduct with the property.  *Id.*

Since 1982, the Court of Appeals for the Seventh Circuit has applied this paradoxical precedent in a variety of contexts.  In 1986, it was asked to determine whether the American Civil Liberties Union of Illinois and two individuals it represented had standing to challenge the constitutionality of a large cross placed on government property during the holiday season. *Am. Civil Liberties Union of Ill. V. City of St. Charles*, 794 F.2d 265 (7th Cir. 1986).  Judge Posner,

9

writing for the Court, explained that "[t]he fact that the plaintiffs do not like a cross to be displayed on public property—even if they are deeply offended by such a display—does not confer standing." *Id.* at 268 (citing *Valley Forge*, *et al.*) Nevertheless, the court in *St. Charles* found standing because "distress is not the only injury that the individual plaintiffs in this case claim to have suffered." *Id.* To avoid seeing the religious display, the individual plaintiffs altered their behavior by taking detours around the streets they would normally use. *Id.* The "tangible if small cost" of the inconvenience "serves to validate, at least to some extent, the existence of genuine distress and indignation." *Id.* That the individuals had altered their behavior to avoid the display was sufficient to give them standing to maintain suit in *St. Charles*. And the Court was not persuaded by the City of St. Charles's argument that the plaintiffs inflicted the cost on themselves and could have avoided it by taking their accustomed routes. *Id.*

Two years later, the Seventh Circuit confirmed that a litigant must indeed change her behavior in response to an allegedly unconstitutional display in order to have standing to maintain suit. In *Freedom from Religion Found., Inc. v. Zielke*, three litigants alleged the display of a monument of the Ten Commandments in a city park violated the Establishment Clause. 845 F.2d 1463 (7th Cir. 1988). Because the individual litigants "admit[ted] that they have not altered their behavior as a result of the monument," the court determined that the psychological harm they complained of was exactly the kind the Supreme Court had said could not confer standing in *Valley Forge*.

The Seventh Circuit has also implied that a crucial question is whether the putative plaintiff is forced to encounter the allegedly unconstitutional display "in his daily routine or … through his participation in government." *Books v. City of Elkhart,* 235 F.3d 292, 300 (7th Cir. 2000) (citing *Doe v. County of Montgomery, Ill.*, 41 F.3d 1156, 1160 (7th Cir. 1994)). In *Books*, the court

reiterated that both the Seventh Circuit and the Supreme Court "have found standing for constitutional challenges to religious conduct when the plaintiffs did not assume a special burden or alter their behavior." *Id.* at 299-300 (citing cases).

Most recently, the Seventh Circuit addressed this issue when a secular organization and several of its members attempted to challenge the content of a presidential address under the Establishment Clause. *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 801 (7th Cir. 2011). The plaintiffs challenged a federal statute which directed the President to declare a National Day of Prayer "on which the people of the United States may turn to God in prayer and meditation in churches." *Id.* at 805 (quoting 36 U.S.C. § 119). In his 2010 proclamation fulfilling the statute's mandate, President Obama said,

> I call upon the citizens of our nation to pray, or otherwise give thanks, in accordance with their own faiths and consciences, for our many freedoms and blessings, and I invite all people of faith to join me in  asking for God's continued guidance, grace, and protection as we meet the challenges before us.

*Id.* at 806.  Plaintiffs' alleged injury was a feeling of exclusion or unwelcomeness when asked by the President "to engage in a religious observance contrary to their own principles." *Id.* at 806-07. The court found the plaintiffs lacked standing to sue because they had not suffered an injury.

Then-Chief Judge Frank Easterbrook, writing for a unanimous Seventh Circuit, relied on *Valley Forge*, saying, "hurt feelings differ from legal injury."  *Id.* at 807.  He also cited *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004), in which the United States Supreme Court held that a non-custodial father lacked prudential standing to challenge the words "under God" in the pledge of allegiance on behalf of his daughter (who was forced to be present for its recitation each morning in public school) because under California law he was not her "next friend." 542 U.S. at 13-16. Judge Easterbrook opined that if a perceived slight or feeling of exclusion were enough to maintain standing, the Supreme Court would have found standing in *Newdow*. 641 F.3d at 807. He

11

wrote that Seventh Circuit cases that embraced observer standing such as *St. Charles* and *Books v. City of Elkhart*, 235 F.3d 292, 299-301 (7th Cir. 2000), likely conflicted with the Supreme Court's more recent decision in *Newdow*.  And Judge Easterbrook recognized the inconsistency within the circuit on observer standing, saying, "[e]ventually we may need to revisit the subject of observers' standing in order to reconcile this circuit's decisions, but today is not the time." *Id.*

Judge Ann Claire Williams concurred in a separate opinion which outlines her opposing view of *Newdow*.  She wrote that *Newdow* was not relevant to the question of observer standing, it was a case about prudential standing turning on whether the plaintiff had the right under California law to litigate as his daughter's "next friend." *Id.* at 810 (Williams, J., concurring).  The *Newdow* court, she noted, did not address Article III standing, and Justice Rehnquist wrote specifically in his concurrence that the majority of the Court "does not dispute that respondent Newdow … satisfies the requisites of Article III standing." *Id.* (quoting *Newdow*, 542 U.S. at 20 (Rehnquist, J., concurring)).  She reiterated the Seventh Circuit's rule that "whether a plaintiff has altered his behavior is not controlling," and explained that "[t]he rule in every other circuit that has considered the question is that while an allegation of a change in behavior is sufficient to confer standing, it is not required." *Id.* at 811 (citing cases).  This disagreement regarding *Newdow's* impact on the Seventh Circuit's observer standing jurisprudence is *dicta*.

From this swath of cases, the Court infers several guiding principles but no hard-and-fast rule on observer standing.  For instance, *St. Charles* and *Zielke* make clear that a person who alters her behavior to avoid a display she believes to violate the Establishment Clause has Article III standing. Standing is also conferred on a plaintiff who "must come into direct and unwelcome contact with the sign in order to participate in [her] local government and fulfill [her] legal obligations." *Doe v. Cnty. of Montgomery, Ill.*, 41 F.3d 1156, 1161 (7th Cir. 1994).  Either of these

facts are sufficient to establish standing, but standing may also exist even where a plaintiff has not altered her behavior or is not required to confront the display to exercise her rights as a citizen. *Books v. City of Elkhart*, 235 F.3d 292, 299-301 (7th Cir. 2000).

Woodring argues that mere unwelcome, direct contact with an objectionable display during a person's every day routine is enough to establish standing. (Filing No. 52 at 12 (citing *Freedom from Religion Found. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 479 (3d Cir. 2016); *Am. Jewish Cong. v. City of Beverly Hills*, 90 F.3d 379, 381 (9th Cir. 1996); *Murray v. City of Austin*, 947 F.2d 147, 150-51 (5th Cir. 1991); *Foremaster v. City of St. George*, 882 F.2d 1485, 1490-91 (10th Cir. 1989); *Saladin v. City of Milledgeville*, 812 F.2d 687, 691-92 (11th Cir. 1987)). Seventh Circuit caselaw does not foreclose that possibility, but the Court need not go that far to find standing in this case. Even though Woodring has not altered her behavior to avoid the crèche on the Courthouse lawn, she has suffered an actual injury because she is forced to encounter the crèche while fulfilling her legal obligations and engaging with her county government.

Woodring's affidavit details the reasons she has traveled or might travel in the future to Brownstown, where she would see the crèche display on the Courthouse lawn. She "frequently travel[s] to and through Brownstown during the course of [her] everyday activities and these travels require [her] to either pass by the Jackson County Courthouse." (Filing No. 32-2.) Beginning in November of 2018, she traveled to Brownstown several times in connection with her divorce. *Id.* at 2. For her employment, Woodring sometimes delivers t-shirts to residents or businesses in Brownstown and she shops at the Jay-C grocery store in Brownstown, both of these activities require her to pass the Courthouse. *Id.* She passes by the Courthouse once per year when driving her son to take a test in Bedford. *Id.* at 2-3. Lastly, she is using the services of the Jackson

County Prosecutor's Office to pursue the collection of child support, which sometimes requires her to drive to Brownstown.  *Id.* at 3.

It is this last fact that is particularly relevant here.  To exercise her right to receive child support, Woodring must interact with the Jackson County prosecutor.  The prosecutor's office is not in the Courthouse, it is in the "new judicial center" located directly behind the Courthouse.  *Id.* at 3. But Woodring is forced to "see the lawn of the Courthouse facing Main Street when [she goes] to the Prosecutor's office." *Id.* That statement from her declaration is consistent with her deposition testimony. The following exchange occurred at her deposition:

Q: Okay. And prior to that one when would your last visit have been to Brownstown?

***

A: I don't know, I couldn't even tell you. I've had to do—I had to go out there for child support I know, and I can't tell you if that was before or after, actually, the last time. But I signed up for, I guess it's—it's not the initial child support, but it's, I guess, to make him pay, kind of enforce it, the enforcement office is where it is.

Q: Okay.

A: I've been down there a couple times to fill out paperwork and that's in the courthouse. It initially—it's always been in the courthouse. It's in the second building, I guess, that's behind the historical courthouse in Brownstown. So, I know I've been there a few times this year. And then for the divorce there's been a few times too.

([Filing No. 38-2 at 83-84](#).)

Like the plaintiffs in *County of Montgomery*, Woodring alleges that she "must come into direct and unwelcome contact with the [objectionable display] in order to participate in [her] local government and fulfill [her] legal obligations." 41 F.3d 1161. It is irrelevant that the prosecutor's office she must visit is in the judicial center behind the Courthouse.  She contends she must go past the Courthouse lawn to get to the judicial center.

Jackson County argues that Woodring has no need of government services in the Courthouse. (Filing No. 38 at 15.) It cites a long portion of Woodring's deposition in which Jackson County's attorney painstakingly catalogued each county office housed in the Courthouse—confirming with Woodring that she had no business with any of them and did not expect to in the future. *Id.* at 8-9 (quoting Filing No. 38-2 at 90-94). This exchange would be detrimental to Woodring's argument had the County erected the crèche *inside* the historical Courthouse, rather than on its lawn.  But because the crèche is outside in plain view, it only matters that Woodring must pass the Courthouse to exercise her rights as a citizen of Jackson County, not that she has no reason to actually enter the Courthouse.

Therefore, even accepting all factual inferences in Jackson County's favor, and interpreting the Seventh Circuit's observer standing jurisprudence as strictly as the Court reasonably can, Woodring has suffered an actual injury.  Her injury is the direct contact she must endure with a display that she alleges violates the Establishment Clause in the course of exercising her rights as a citizen of Jackson County.  Because the Court has determined that Woodring has sustained an actual injury through her confrontation with the crèche, it need not address Woodring's argument that she has standing as a taxpayer in Jackson County. (Filing No. 52 at 8-9.)

### 2.   **Redressability**

An actual injury is insufficient on its own to confer Article III standing; Woodring must also show that her injury is redressable by a favorable decision from this Court.  The requirements that a plaintiff's injury be "fairly traceable" to a defendant's conduct, and that the injury be "redressable" by a favorable judicial decision were "initially articulated by [the Supreme] Court as two facets of a single causation requirement." *Allen v. Wright*, 468 U.S. 737, 754 n. 19 (1984). The Supreme Court subsequently elaborated that, to the extent that there is a difference between

the two inquiries, "it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Id.* (internal citation and quotation omitted).   In short, two factors govern the Court's redressability inquiry:   Woodring's alleged injury and her requested relief.

In her Complaint, Woodring asks the Court to "[d]eclare that the defendant has violated the rights of the plaintiff," "[i]ssue a permanent injunction prohibiting the defendant from displaying the crèche and Nativity scene on the lawn of the Jackson County Courthouse," and "[a]ward the plaintiff her costs and attorneys' fees." (Filing No. 1 at 4.) Jackson County argues that discovery has shown that "every aspect of Christmas and the County's challenged display is allegedly offensive to [Woodring]," and thus "an order enjoining the Nativity scene alone would not ameliorate [her] offense." (Filing No. 38 at 28.) But Seventh Circuit law instructs the Court to look at the Complaint, rather than the factual record. "The test for standing, as for jurisdiction generally, is the good-faith allegations of the complaint, rather than what the evidence shows…. If a plaintiff merely fails to *prove* injury, his failure goes to damages (or in an equity case … to the right to obtain an injunction)." *St. Charles*, 794 F.2d at 269 (internal citation omitted).

A review of the Complaint reveals that Woodring's alleged injury is redressable by an order from this Court.  Woodring alleges that the display of the crèche on the Courthouse lawn "violates the Establishment Clause of the First Amendment to the United States Constitution" and that she objects to the display. (Filing No. 1 at 4.) She asks for an injunction prohibiting the County from displaying the crèche on the Courthouse lawn.  *Id.*  It is a remedy this Court is empowered to issue, and one that would directly redress her grievance.[2]

---

[2] Even if the Court were to accept the County's invitation to consider the record, it would not save the County's redressability argument. Portions of Woodring's deposition indicate that she objects to *all* elements of the display,

Because Woodring has alleged an injury, the injury allegedly was caused by Jackson County's conduct, and the injury is redressable by this Court, she has standing to maintain this action. Thus, the Court will turn to her Establishment Clause challenge.

## B.    First Amendment

The sole question before the Court on the parties' cross-motions for summary judgment is whether the crèche displayed on the Jackson County Courthouse lawn violates the Establishment Clause of the First Amendment. On this issue, the record reveals no material facts are in dispute.

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." The jurisprudence interpreting this clause is, to put it mildly, muddled. The most established and best-known interpretive test for the Establishment Clause, articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), held that a government action is constitutional if (1) it has a secular purpose, (2) it has a principal or primary effect that neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion. *Id.* at 612-13. But the *Lemon* test is and has been controversial at both the Supreme Court of the United States and lower courts. Recently, a plurality of the Supreme Court declared, "[i]f the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met. In many cases, the Court has either expressly declined to apply the test or has simply ignored it." *Am. Legion v. Am. Humanist Assoc.*, 139 S. Ct. 2067, 2080 (2019) (citations omitted). In *American Legion*, a plurality of the Supreme Court opined that the *Lemon* test was particularly ill-suited to resolve Establishment Clause cases that

---

including arguably secular symbols like Santa Claus. (Filing No. 38-2 at 59-60.) She also said that she would still object to the display if the County added more arguably secular elements such as a Christmas tree. *Id.* at 86-90. But a personal objection to these secular elements does not amount to an allegation that they violate the Establishment Clause. Woodring may object to any number of actions the Jackson County government has taken; the only relevant objections are those included in her Complaint and alleged to be unconstitutional.

17

involve "the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Id.* (Footnote omitted).

Although it frowns upon the *Lemon* test, *American Legion* does not offer its own test for dealing with these types of cases except to encourage the "application of a presumption of constitutionality for longstanding monuments, symbols, and practices." *Id.* at 2081-82.[3] Thus, the Court looks to *Freedom from Religion Found., Inc. v. Concord Cmty. Schs.*, 885 F.3d 1038 (7th Cir. 2018), in which the Court of Appeals for the Seventh Circuit determined the constitutionality of a public high school's musical holiday show that contained a Nativity scene and Christian hymns performed by students. In that case, the Seventh Circuit analyzed the contested government action under three different tests advanced at one time or another by the United States Supreme Court: the endorsement, coercion, and purpose tests.

The endorsement test originated in 1984 in a concurrence by Justice O'Connor and was approved by a majority of the court a few years later. *Lynch v. Donnelly*, 465 U.S. 668, 691-92 (1984) (O'Connor, J., concurring); *Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 592-94 (1989), *abrogated on other grounds by Town of Greece v. Galloway*, 572 U.S. 565 (2014). The test asks whether a government action "communicates a government's endorsement of a religion or a particular religious belief." *Concord Cmty. Schs.* at 1046. To determine whether a practice endorses religion, the Court must look at the totality of the circumstances surrounding the challenged conduct from the perspective of a reasonable observer. *Id.* (citation omitted). "The reasonable observer is aware of a situation's history and context and encompasses the views of adherents and non-adherents alike." *Id.*

---

[3] *American Legion* did not give a precise definition of the word "longstanding," but the monument it concerned, a 32-foot tall Latin cross memorializing those who perished in World War I, was erected in 1925, making it more than 90 years old when the Supreme Court ruled in 2019 that it did not violate the Establishment Clause. 139 S.Ct. at 2076-77.

As the Seventh Circuit has said, "the story of the nativity is a core part of Christianity, and it would be silly to pretend otherwise." *Id.* For that reason, many but not all Nativity scenes "run a serious risk of giving a reasonable viewer the impression of religious endorsement." *Id.* The Court has no doubt that a lone Nativity scene of the size on prominent display on government property in Brownstown would be one of those Nativity scenes that gives a reasonable viewer the impression of religious endorsement. Here, however, the Nativity scene is not on its own. It is accompanied by two other arguably secular symbols of Christmas: Santa Claus and a group of Christmas carolers. (Filing No. 32-1 at 72.)

Nevertheless, two facts persuade the Court that this Nativity scene would give a reasonable observer the impression that the government is endorsing a religion. The first of those facts is the geography of the display. A picture of the Courthouse lawn shows that Santa and the carolers are placed to the far side of the display, away from the more centralized Nativity display, which straddles the sidewalk subdividing the lawn. *Id.* The crèche is the vast majority of the display because it is arranged to straddle the sidewalk, making it appear much larger than the solitary Santa figure. *Id.* The carolers have been placed in the back of the display, lessening the attention they would draw from an observer. *Id.*

The second fact that convinces the Court that the Nativity scene would give the impression of a religious endorsement is the scene's history. For many years, it was only a Nativity scene, with no secular elements at all. From roughly 2000 until 2018, the display consisted solely of a Nativity scene. But in 2018, in response to a letter from the Freedom from Religion Foundation questioning the display's constitutionality, the President of the County Commissioners, Matt Reedy, physically moved Santa Claus and his sleigh and reindeer and the carolers to a place nearer the crèche. (Filing No. 32-1 at 17-18, 28, 72.) "The reasonable observer is aware of the situation's

history and context." *Concord Cmty. Schs.* at 1046.  The addition of less prominent secular symbols at the fringes of the display is not enough to counteract the impression a reasonable observer would have gotten from seeing the Nativity display placed on the lawn of the Courthouse for nearly 20 years.  The Court has no doubt that a sufficient balancing between secular and non-secular elements could bring this display into harmony with the First Amendment despite its history, but that balancing has not occurred here.  Thus, the display fails the endorsement test.

The second approach the Seventh Circuit applied in *Concord Community Schools* is the coercion test.  This test asks whether the government has applied coercive pressure to support or participate in religion. *Concord Cmty. Schs.* at 1048. The test is more often used for things like prayer in school, where someone is being encouraged to participate in a religion he or she may not wish to practice.  Leaving aside whether the coercion test is appropriate for this government action, the Court is convinced that the Nativity display at issue passes the test.  It is a visual celebration of the birth of Jesus Christ.  It does not require citizens of Jackson County to do anything but look at it, and perhaps not even that.  Woodring clearly encounters the display on a semi-regular basis, and as the Court determined in Section III.A.1, she must encounter it to engage with her county government.  But unwelcome contact with a religious symbol falls short of action coercion—Woodring and other Jackson County residents are not asked or pressured to participate in Christian activities. However, of these first two tests, the endorsement test is the better framework for determining the constitutionality of this display.

The last test is the purpose test—a practice is unconstitutional if it lacks a secular objective. *Concord Cmty. Schs.* at 1049.  The Court defers to a government's statement of its own aims, but the professed objective cannot be a sham or secondary to a religious goal. *Id.*  With the exception of 2001, the display or some variation of it has been placed on the Courthouse lawn every year

since at least 2000. (Filing No. 32-1 at 13-14.) Following the logic of *American Legion*, Jackson County argues that length of time between when the display was originally implemented and today "makes determination of the original purpose behind Jackson County's inclusive holiday display especially difficult." (Filing No. 38 at 32 (quotation omitted).) The Court disagrees. Unlike the over 90-year-old Peace Cross at issue in *American Legion*, the record provides documentary evidence of the origins of this display, which is likely no more than 20-30 years old.

According to the "Minutes of the Special Meeting Jackson County Commissioners" on December 27, 2001, the then-President of the Commissioners "publicly apologized for not having a nativity scene in the Courthouse yard." (Filing No. 32-1 at 67.) The County designate testified that, prior to 2001, a Courthouse custodian "borrowed a display from a local church and placed it out on the courthouse lawn." *Id.* at 13. In a Commissioners Meeting on October 15, 2002, a representative from the Brownstown Chamber of Commerce asked the Commissioners for permission to "put out yard decorations for the Christmas celebration to be held on November 23, 2002." *Id.* at 68. The Commissioners approved the motion. At a May 2003 meeting, the same representative "stated that the Brownstown Ministerial Association purchased a lighted nativity scene … and would like to put this up in the Courtyard for the Christmas holiday." *Id.* at 70. The Commissioners approved.

So the record does contain evidence about the origins of the current iteration of this display. The evidence reveals that, in 2001, a County government official apologized specifically for failing to put a "nativity scene," rather than holiday decorations or Christmas decorations, on the Courthouse lawn. Prior to that year, a display borrowed from a local church was placed on the lawn. The record also shows that the current figures displayed on the Courthouse lawn were purchased by the Brownstown Ministerial Association, which the Court infers is a body consisting

of clergypersons local to Jackson County. These facts indicate that the display was initially religious in nature, rather than a general celebration of winter holidays. Jackson County has not designated any evidence to show that the initial purpose of the display was anything other than religious in nature. Because the only evidence in the record indicates that the County's purpose in displaying the Nativity scene was religious, the display does not pass the purpose test.

Therefore, two of the three tests employed by the Seventh Circuit in *Concord Community Schools* indicate the display violated the Establishment Clause. The only test that favors Jackson County, the coercion test, is not an ideal framework by which to analyze Woodring's claim. As noted earlier, the coercion test is most often used in cases involving prayer in school or, as in *Concord Community Schools*, hymns and a Nativity scene at a public high school's holiday show featuring students' choral, instrumental, and dance performances. As the court stated in *Concord Community Schools*, "coercion concerns are heightened when the conduct at issue involves elementary and secondary public school students. 885 F.3d at 1048. The Court believes the endorsement and purpose tests are better for determining the constitutionality of a religious display on government property. The display fails both tests. Because it fails these two tests, the Court holds that Jackson County's Nativity scene violates the First Amendment's Establishment Clause. Jackson County appears to endorse a religion—Christianity—and lacks a secular purpose for displaying the Nativity scene. Accordingly, Woodring is **granted** summary judgment and Jackson County's cross-motion is **denied**.

## IV.    CONCLUSION

For the reasons set forth above, the Court concludes that Jackson County has violated the rights of Woodring and its other citizens by displaying a religious symbol on government property in violation of the First Amendment. As noted earlier, a sufficient balancing between secular and

non-secular elements could bring the display into harmony with the First Amendment, however, at present, it does not. As no material facts are in dispute and Woodring has shown that she is entitled to judgment as a matter of law, the Court **GRANTS** her Motion for Summary Judgment (Filing No. 32) and **DENIES** Jackson County's Cross-Motion (Filing No. 38). The Court awards Woodring the relief she seeks in her Complaint.  Jackson County is hereby enjoined from displaying the crèche as presently presented, on the lawn of the historical Courthouse. Additionally, pursuant to 42 U.S.C. § 1988, Jackson County shall pay Woodring's reasonable costs and attorneys' fees associated with this litigation.  Final judgment will issue in a separate order.

      **SO ORDERED.**

Date:  4/29/2020

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Stevie Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Daniel J. Schmid
LIBERTY COUNSEL
dschmid@lc.org

Horatio G. Mihet
LIBERTY COUNSEL
hmihet@lc.org

Roger Karam Gannam
LIBERTY COUNSEL
rgannam@lc.org

Susan D. Bevers
LORENZO LAW OFFICE
sdbevers@jefflorenzo.com